**ANDREW JENKINS,**

      **Plaintiff,**

    **v.**

**CITY OF CHARLOTTE,**

      **Defendant.**

**MEMORANDUM AND ORDER**

    **THIS MATTER** is before the Court on the Defendant's "Motion for Summary Judgment" (document #11), "Memorandum of Law in Support . . ." (document #11-2), and supporting exhibits (document ##11-15), all filed February 28, 2007. The Plaintiff filed his ". . . Memorandum of Law and Authority in Opposition . . ." (document #18), and supporting exhibits (document ##18-19) March 15, 2007. On April 2, 2007, the Defendant filed its ". . . Reply in Support of Motion for Summary Judgment" and supporting exhibits (document #22).

    The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and this motion is now ripe for disposition.

    Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>grant</u> the Defendant's Motion for Summary Judgment, as discussed below.

## I. PROCEDURAL AND FACTUAL BACKGROUND

This is an action alleging retaliation and termination in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e-2(e)(1) ("Title VII"). The Complaints[1] also seek damages for the Defendant's alleged negligent supervision of an employee, intentional infliction of emotional distress, and wrongful termination in violation of the public policy of the State of North Carolina, although the Plaintiff expressly abandoned his claim for intentional infliction of emotional distress in his "Memorandum . . . in Opposition" (document #18).

### A. <u>Factual Background</u>

On June 2, 1997, the Plaintiff began working, in a temporary capacity, as a Drafting Technician II in the Defendant's Engineering Department (employed by a temporary employment agency). Approximately six months later, on December 10, 1997, the Plaintiff was hired by the Defendant as a temporary employee and less than two months later, on February 2, 1998, became a permanent employee <u>and</u> was promoted to the position of "District Supervisor" in the Street Maintenance Division. A year and a half later, on November 10, 1999, the Plaintiff was promoted again, this time to the position of "Operations Supervisor."

Altogether, during his employment in the Street Maintenance Division (1998 through 2002), the Plaintiff was promoted twice, received nine salary increases, and one lump sum payment for career development.

In spite of these positive acknowledgments, however, there were problems with the Plaintiff's performance for which he was eventually placed on a 90-day "performance probation." Shortly thereafter, on May 17, 2002, the Plaintiff filed his first Charge of Discrimination with the Equal

---

[1] The Plaintiff originally had two civil actions pending in this Court, but moved to have the two actions consolidated. The Motion for Consolidation was granted, and 3:04CV386-H became the lead case, causing 3:04CV610-H to be closed. Although the Complaints were originally filed in separate actions, due to consolidation, this Order addresses both (document #1 in 3:04CV386-H, and document #1 in 3:04CV610-H).

Employment Opportunity Commission ("EEOC"). In its standard "Dismissal and Notice of Rights" letter, dated November 2, 2002, the EEOC reported that it was "unable to conclude that the information obtained establishes violations of the statutes." Thereafter, the Plaintiff timely filed a Complaint in this Court, civil action number 3:03CV44, which was dismissed on the Defendant/City's Motion for Summary Judgment on July 26, 2005.[2]

In August of 2002, the Plaintiff applied for the position of Drafting Technician III in the Defendant's Engineering Department. The Plaintiff was selected for this position in part based on his representation that he was proficient in the use of AutoCAD 2000i and Land Development Desktop 2i software, the uses of which are essential to the position. The Plaintiff began the new position, which resulted in another increase in salary, on October 21, 2002.

The Plaintiff's new supervisor, Mark Hance, noted problems with the Plaintiff's performance right away, including a lack of expertise in the necessary software programs, not completing work assignments on time, not taking initiative to seek out new assignments, frequent mistakes on time sheets, and a general lack of communication with his peers and supervisor (Mr. Hance). As a result, the Plaintiff was given a marginal performance rating on his October 21, 2003[3] annual review, which

---

[2]The Honorable David C. Keesler granted the City of Charlotte's Motion for Summary Judgment. The Plaintiff's claims in that action were based upon alleged race discrimination in the form of disparate treatment, a hostile work environment, and retaliation. In granting summary judgment, Judge Keesler found that the Plaintiff's claims of disparate treatment failed because he could not establish that race was a motivating factor in any adverse employment decision. The hostile work environment claim failed because the objectionable comments about which the Plaintiff complained were not sufficiently pervasive to amount to a hostile work environment. Finally, regarding the Plaintiff's retaliation claim, the Court found: (1) the negative performance appraisal did not constitute an adverse employment action, and even if it did, the Defendant had proffered a legitimate, non-discriminatory reason for the action which the Plaintiff had not rebutted as being pretextual; (2) as to the probationary period, the Defendant had proffered a legitimate, non-discriminatory reason for the action which the Plaintiff had likewise failed to rebut as pretextual; and (3) that there was no adverse employment action taken after the Plaintiff's filing of his EEOC Charge of Discrimination.

[3]The annual review was dated October 21, 2003, but Mr. Hance did not sign it until November 19, 2003. Mr. Tim Greene, another department member, did not sign the review until December 15, 2003.

Mr. Hance explained as follows:

> Andrew's FY03 performance is rated Marginal Performance (M), "Performance did not consistently meet or only met minimum job requirements." Andrew's performance during his first year in Engineering Services has not met my expectations. Due to Andrew's prior City experience, prior CAD experience and prior supervisor experience I expected more from him in his first year. I expected Andrew to be proficient in AutoCAD, have better communication skills and expected him to take more initiative.
>
> During Andrew's employment interview he classified himself as an expert in AutoCAD. Although he demonstrates knowledge of AutoCAD his work falls well short of the expert level. Most of his CAD assignments take much longer than expected to complete. His CAD work is neat and usually accurate but the level of neatness and accuracy does not justify the amount of time he needs to complete his work.
>
> He worked on the N. Tryon Add-a-Lane project early in the year. The project progressed much slower than expected. I often asked him if he had any questions and he frequently responded that he did have any questions.[4] He has also assisted our Senior Engineer on the Bascom/Weddington Sidewalk project. The drafting assignments he received from the Senior Engineer took longer than expected. I observed that Andrew would complete his work and not communicate to the Senior Engineer that he was done and was available for additional work. In September, as he worked on the South Blvd. Median project I suggested a faster way to hatch features in the drawing. Andrew did not attempt what I had suggested and his assignment took much longer than expected to complete.
>
> Andrew always conducts himself in a professional manner. He treats his coworkers with respect and is very professional dealing with citizens and representatives from client departments. I am confident he presents himself in a professional manner when representing the In-House Design group. However, Andrew is distant to staff in our work group. He rarely speaks in group meetings. He doesn't appear to be interested in his work or sometimes appears to be not focused on his work. On September 10th Andrew did not attend a project meeting that he was asked to attend. Earlier in the day I spoke to Andrew and he said he was aware of the meeting and understood that he was responsible to plot a drawing for the meeting. He returned to the office after the meeting had concluded and stated that he had forgotten about the meeting. Upon further discussion I realized he was not prepared for the meeting. He had not plotted the drawing that was needed for the meeting.

---

[4]Although not material to this decision, it is assumed that Mr. Hance intended to write that the Plaintiff "frequently responded that he did [not] have any questions."

Andrew rarely asks questions and provides little feedback when questioned about work he has completed. He needs to improve his communication skills. On a few occasions this year Andrew and I have met to discuss the need for him to communicate better, keep his timesheet up to date and increase his AutoCAD proficiency. April 30th Andrew and I met to discuss the need for him to better communicate his leave request. Since that conversation Andrew has improved communicating his request for vacation, sick and FMLA leave. In August we met to discuss frequent mistakes on his timesheet. After our meeting we discovered the problem was the software recording and reporting his FMLA vacation request. Since our meeting in August Andrew has been proactive ensuring his timesheet is accurate. He provides a print out of his timesheet to me every Friday afternoon. Most recently, during Andrew's yearend review, Andrew and I discuss[ed] his CAD proficiency. He stated that there wasn't any particular reason why his work[] seemed to take longer than expected; lack of CAD proficiency was related to learning some of the features of the new version of the software and becoming familiar with our work group. During this meeting we discuss[ed] giving Andrew more short term drafting assignments.

I expect Andrew to take more initiative to learn. He needs to tap into the experience others have within our group, look at construction plans of previous projects for direction and explore AutoCAD to help our group expand our use of CAD. When Andrew completes an assignment I expect him to review his work prior to returning it to me or one of the other engineers. He is also expected to communicate that he has completed his work and is available for more work.

Occasionally, Andrew has shown that he is capable of better work. He sought input from others in the group during a staff meeting regarding changes to our CAD standards and on one occasion he worked until 7:30pm to complete an assignment prior to taking vacation leave the next day. Andrew has met some of the objectives on his FY03 performance plan (see attached). He met his goal for Objective #1 Client/Customer Service and Objective #2 Process Improvement. He did not meet or take enough initiative to me[e]t Objective #3 Job Knowledge and Skills and Objective #4 Teamwork/Teambuilding. In FY04 Andrew will need to develop a performance plan with more measurable objectives.

I think Andrew lacks the vision of the final product that he is trying to produce. During the past few months I have changed his role in the group. I have tried to assign him short duration task[s] on different projects to help expose him to more of our work. In FY04 he will continue to work in this capacity to help him increase his CAD proficiency and give him more exposure to our projects and the construction documents that we produce. In the upcoming year Andrew needs to focus on increasing his AutoCAD proficiency, take more initiative to learn about our work, take more initiative to explore AutoCAD to help increase our group's use of CAD

and improve his communication skills. Andrew will need to develop a FY04 performance plan that addresses these areas of needed improvement that are listed above.

On December 30, 2003, the Plaintiff submitted the following written response to Mr. Hance's comments:

I am surprised by Mark Hance's comments regarding my performance over the past year. He has often complimented my work and during my mid year review stated that he was pleased with my performance. (see attached)

During the employment interview I informed Mark that I had not worked with the AutoCAD software in several years. That since that time there had been three upgraded versions along with a shift from Softdesk to the current Land Development Desktop and that I had not received training on the newest version. He was also aware that my positions with CDOT/SMD for the previous five years did not require nor provide me with the AutoCAD software. I did not say or expect anyone to believe that I was an expert with the software.

I was not informed that my progress on the N. Tryon Add-a-Lane project or any other project was moving slower than expected. The tasks I performed on the Bascom/Weddington sidewalk project was returned to the Senior Engineer within his requested time frame. This is the first time I have been informed that there was a problem.

I have worked on nearly 12 projects this past year and no one has accused me of marginal performance. To the contrary, I have received very positive feedback from Tonia Wimberly, Todd Thorne, Derrel Poole, Valerie Valencia, Jim Gerton and Mark Hance.

Recently in a "section meeting" several members including Mark, offered a way to perform a particular hatching technique on the South Blvd median project. I did not realize that Mark intended for me to choose his suggestion over the others. To my knowledge, the project met the schedule of the project engineer.

The September 10th project meeting between Mark, Imad and myself had been rescheduled and changed to different dates, times and locations. (see attached e-mail) While I was at one of the two locations, Mark and Imad were meeting at the other. I met with both Mark and Imad separately afterwards for less than 10 minutes. I am not aware of any delays with the project.

Because of inconsistencies between my timesheet and payroll, Mark accused me of

attempting to steal from the City of Charlotte by intentionally falsifying FMLA time. As a result, I have been instructed to turn in a weekly timesheet although it was discovered that the problem was related to the software as noted in Mark's comments. Furthermore, I believe Mark's description during this session of former employee Debbie Green's circumstances was an attempt to influence my use of FMLA through intimidation.

I have spoken with Mark about my desire for training, our lack of communication and unclear instruction. I explained that on several projects, including Washington Heights and South Blvd, I had received relayed directions from co-workers that lacked necessary information.

On several occasions I have worked additional hours before going on leave. By Mark's request I have performed work from home while off and worked through lunch without regard for compensation. I have never refused to assist co-workers in an effort to help meet objectives. I have enrolled in UNCC working toward obtaining a BS in Civil Engineering Technology. I believe all of these are examples of taking initiative toward progress.

I believe that Mark Hance's comments in this PRD have been misleading and do not accurately recognize my accomplishments. My performance plan was pre-approved by Mark.

Following this review, on January 15, 2004, the Plaintiff asked for and was granted permission to take an outside class which met three times a week in the middle of the workday. However, Mr. Hance later changed his mind because he said it would not allow him to supervise the Plaintiff's time. Mr. Hance's decision not to allow the Plaintiff to take a class during the workday formed the basis of the Plaintiff's second administrative Charge of Discrimination to the EEOC, which was filed February 4, 2004.

The Plaintiff asserts that denial of his request to take a class during the workday was in retaliation for his prior allegations of civil rights' violations. In support, the Plaintiff points to the timing of the November 24, 2003 deposition (in civil action number 3:03CV44) of Mr. David Sanders, a member of the Defendant's Human Resources Department. The Plaintiff contends that

his review was retaliation for the same reason – noting that although the review was dated October 21, 2003 (before the deposition), it was not signed by Mark Hance until November 19, 2003, and not signed by Tim Greene until December 15, 2003 (after the deposition).

The next significant event was a March 3, 2004 meeting between the Plaintiff, Mr. Hance, and Mr. David Meachum, the department head, in which the Plaintiff was directed to submit written goals to improve his work performance. The Plaintiff did not complete this assignment until March 31, 2004 (after another request from Mr. Hance). Among the Defendant's expressed concerns regarding the Plaintiff's job performance at that time were his continuing need to improve AutoCAD proficiency, and his lack of productivity, deficient communication skills, and taking of unscheduled leave. (During the first four months of 2004, the Plaintiff took unscheduled leave on at least eight occasions.[5])

On April 22, 2004, the Plaintiff was given an "unacceptable" rating on his six-month review and placed on 90-days probation, which Mr. Hance explained and detailed as follows:

> Andrew's performance for the above referenced period is rated "Unacceptable Performance" and warrants Andrew be placed on performance probation. During this period Andrew has required an unacceptable level of guidance and supervision to consistently complete his work at a satisfactory level for his position as a Drafting Tech. III. When Andrew is given independent assignments his work takes much longer than expected to complete. At times he is not focused and he is occasionally away from his desk for long periods of time for unacceptable reasons. When Andrew is given short duration tasks and is closely supervised his performance is generally acceptable. However, this position should not require this level of supervision.
>
> On March 3, 2004 David Meachum and I met with Andrew to discuss his marginal performance rating on his FY 03 performance plan (completed 12/2003). We

---

[5]The Defendant alleges that the Plaintiff took eleven days of unscheduled leave during these four months. However, the Plaintiff responds that three of these days were "snow days." Because the Court must view the facts in the light most favorable to the nonmoving party, it will be assumed that the Plaintiff only had eight days of unscheduled leave.

communicated expectations for his position and discussed creation of a performance plan with specific measurable objectives to help measure Andrew's performance in FY04 & FY05. I provided Andrew a written copy of my expectations for the Drafting Technician III position (see attached). During the meeting we reviewed the written expectations and we discussed specific objectives that we would like Andrew to incorporate into his performance plan. Andrew provided feedback during the meeting and agreed to develop a performance plan based upon the list of expectations that were provided.

1) On March 11th I approached Andrew regarding a deadline to submit his performance plan for review. Andrew stated he would complete his performance plan and submit it to me by March 25th. The deadline of March 25th passed without Andrew submitting his performance plan. On the morning of March 31st I approached Andrew regarding the status of his performance plan. He stated that it was complete. He emailed me a copy later that afternoon. I have reviewed Andrew's performance plan and concluded that it is unacceptable. His performance plan lacks specific measurable objectives. The plan does not list how or when objectives will be measured and some objectives that are listed are common, minimal expectations that are expected of all employees. Andrew is required to address my redline comments written on his performance plan and resubmit by April 30th.

2) Andrew takes much longer than expected to complete assignments that do not have an impending deadline and assignments he completes with limited direct supervision. In early March Andrew was given an assignment to complete by the end of April. This assignment was expected to take approximately 4 hours to complete. Andrew was directed to complete this assignment when he didn't have other work. During the past month Andrew often said he was working on this assignment. As of March 31st Andrew had charged 13 hours on his timesheet to this project. On April 1st I questioned him about the amount of time that he had spent to date on the assignment. He said it was now complete. On his most recent timesheet he has logged a total of 11 hours to complete this assignment. Andrew revised his timesheet for the week of March 29th after our discussion on April 1st. This assignment took approximately 3 times longer than expected to complete.

3) On April 1st at 3:15pm I noticed Andrew was signed-out to CDOT until 3:40pm. Andrew returned to his desk at 4:10pm. I was surprised that Andrew needed to be in CDOT for such a long period of time. Upon his return I approached him regarding his extended absence from his office. He stated that he delivered plans to someone in CDOT and discussed a CAD question with another CDOT employee. I continued to question the amount of time spent to complete the items [] that he listed. He then provided additional reasons for his long absence from the office. Andrew did need to deliver plans to CDOT. However, the duration of his trip to CDOT was not justified. The other reasons provided also do not warrant the amount of time spent

away from the office. I informed Andrew that this is not productive use of his time. Recently, another manager within our division noted seeing Andrew on the 2nd floor of our building on two separate occasions during normal work hours. I do not know of any work related reason for Andrew [to visit] the 2nd floor to complete his assignments. I believe these are examples that help explain other instances that I have noticed Andrew away from his office for longer than normal periods of time for his position.

In the March 3rd meeting I clearly communicated my expectations to Andrew. Andrew had stated that he understood and he would develop a performance plan to focus on improving. Andrew's performance has not improved. The three situations listed above are examples of Andrew's unacceptable performance, the reason Andrew is being placed on performance probation. These situations occurred after our meeting on March 3rd and indicate that Andrew is not taking the necessary steps to improve his performance. He did not ask for assistance or clarification when he was preparing his performance plan. The time he needed to complete the assignment listed above and his extended, unwarranted absence from his office on April 1st demonstrate that he continues to under perform when he is not closely supervised. After discussing these concerns with Andrew on April 1st, he completed 2 work assignments on April 2nd. The assignments were completed correctly and within the requested timeframe. The completion of these assignments demonstrates that Andrew can do the work that is assigned to him in a timely manner. The expectation for Andrew is to consistently perform at this level. As discussed on March 3rd, Andrew is expected to work efficiently, seek assistance when needed, take initiative to seek additional work when he is available and communicate when he has completed his work. These expectations should be achieved with minimal supervision and guidance. To date Andrew has not demonstrated that he can consistently meet these expectations without significant direct supervision. Andrew is being placed on 90-day performance probation. Andrew is required to complete a performance plan by April 30th and demonstrate that he is meeting the objectives of the performance plan during the next 90 days. Failure to meet job expectations as indicated in his performance plan will result in disciplinary action up to and including termination. His next formal performance review will be on July 22, 2004, with less formal performance reviews at approximately the 30 and 60 day milestones.

On June 2, 2004, the Plaintiff met with Ms. Gracie Myers, an employee in the Defendant's Human Resources Department, to complain about what he perceived as retaliation for his then pending lawsuit. The Plaintiff alleges that Ms. Myers said she would speak with certain employees in the engineering department and get back in touch with him, but that she never did. The Plaintiff

also alleges that Ms. Myers opined in their June 2, 2004 meeting that he should not have been placed on performance probation.

On or about June 28, 2004, the Plaintiff submitted the following response to his evaluation:

*This is my response to the E&PM decision to place me on performance probation and follows my meeting with the Human Resources department.*

I have successfully met the requirements of my position and have completed every assignment within the requested time. This probation document fails to present specific accounts of negligent or unsuccessful fulfillment of my responsibilities. It is inconsistent with the process of documenting performance issues and is based overwhelmingly on assumptions. It is an emotionally charged document, occurring shortly after I filed a complaint with the EEOC. I believe this action to be unlawful harassment and was taken in retaliation for my complaint.

Six months into my <u>yearly</u> performance review there were no established objectives. Three weeks after I filed a complaint with the EEOC, the division decided to establish performance objectives. One month later I was placed on performance probation.

I am unclear of the supposed violations and I found it difficult to prepare a response. My supervisor claims that I have eaten lunch at my desk; that I was seen on the second floor of the building; and that I did not use the sign in/sign out log correctly. He also alleges that **<u>a</u>** project was completed a month ahead of schedule but required three times longer than expected to complete. Without more specifics I am not aware of this project, however if this were true, I'd think it would have been brought to my attention before now.

The criterion for disciplinary action is established to prevent arbitrary enforcement of the policy. The division has decided to ignore those rules, to force an outcome more desirable to its liking. This inconsistency severely undermines its credibility and compromises the process.

Human resource's inability and reluctance to intervene when supervisors abuse their authority illustrates a fundamental problem with the City's grievance process. Employees are left alone to contend with illegal discrimination, harassment and retaliation.

I have successfully met the requirements of my job description. I have been involved with more than a dozen projects within the past year and have not been advised of a problem in any. The absence of prior disciplinary documentation indicates there

were NO problems.  I disagree with this probation document and believe it should
be overturned.

At the end of the probationary period, July 22, 2004, Mr. Hance again concluded that the

Plaintiff had failed to make the necessary improvements to achieve an acceptable performance rating.

At that point Mr. Hance and Mr. Meachum met with the Defendant's Assistant Director of Human

Resources, Cheryl Brown, and determined that termination was appropriate and necessary.  The three

reached this decision based upon the fact that the problems had been ongoing for two years,

repeatedly counseling the Plaintiff had yielded only limited results, and because this was his second

period of probation (the first being prior to the Plaintiff's transfer to Mr. Hance's department).

The Plaintiff's termination, on August 4, 2004, was the subject of his third Charge of

Discrimination which was timely filed with the EEOC.

### B. <u>Procedural Background</u>

The Plaintiff's February 4, 2004 Charge of Discrimination describes the alleged retaliatory

discrimination as follows:

I.  I am currently employed by the above entity, "the City," in the position of
Drafting Technician.  In January of 2003, I filed an anti-discrimination
lawsuit against the City.  In December of 2003, David Sanders, Senior
Human Resources Analyst, City of Charlotte, was deposed.  On January 15,
2004, Mark Hance, (my immediate) Supervisor, granted me permission to
take a college course.  On January 16, 2004, Hance met with Sanders.  On
January 20, 2004, I was subjected to an adverse term and condition of
employment in that the City rescinded its prior permission.

II.  Hance told me that he was denying the previously approved request because
he had "not had time to think about it."  Hance also told me that if the class
had been held at the end of the day, the City could have made allowances.

III.  I believe that I have been discriminated against in Retaliation, 704a, because
I opposed unlawful employment practices, in violation of Title VII of the

Civil Rights Act of 1964, as amended.

The Plaintiff's third Charge of Discrimination, filed August 9, 2004, alleged further retaliation as follows:

> I was employed by the above employer about seven (7) years. For the past two years, I was a Drafting Technician III. I filed an EEOC charge that was dismissed on July 16, 2004. Following the dismissal of my EEOC charge, I was terminated August 4, 2004.
>
> The reason given by Jim Shumacher, City Engineer, was that my performance did not meet expectations.
>
> I believe that I was discharged in retaliation because I filed an EEOC charge, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Following receipt from the EEOC of what is commonly referred to as a "right to sue letter" regarding each of these Charges, the Plaintiff filed a Complaint August 9, 2004, and then a second Complaint December 10, 2004. On July 12, 2006, upon the Plaintiff's Motion, the two actions were consolidated.

As noted, on February 28, 2007, the Defendant filed its Motion for Summary Judgment, which has been fully briefed and is, therefore, ripe for determination.

## II. DISCUSSION OF CLAIMS

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." See also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue

for trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. <u>Id</u>. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. <u>Id</u>. at 255; <u>Miltier v. Beorn</u>, 896 F.2d 848, 850 (4th Cir. 1990); <u>Cole v. Cole</u>, 633 F.2d 1083, 1089 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal quotations omitted).

Regarding the Plaintiff's state public policy claim, North Carolina courts "look to federal decisions [in Title VII cases] for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." <u>N.C. Dept. of Correction v. Gibson</u>, 308 N.C. 131, 136, 301 S. E. 2d 78, 82 (1983). <u>Accord</u> <u>Henson v. Liggett Group, Inc.</u>, 61 F.3d 270, 277 (4th Cir. 1995); <u>and</u> <u>Phillips v. J.P. Stevens & Co., Inc.</u>, 827 F. Supp. 349, 353 (M.D.N.C. 1993) ( "The public policy of North Carolina expressed in N.C.G.S. § 143-422.1 et seq. is essentially identical to the public policy articulated in Title VII").

Accordingly, the undersigned will apply the elements and paradigm of proof established for a Title VII claim to determine the Plaintiff's state public policy claim.

**B. Retaliation**

In addition to prohibiting harassment or discrimination in the workplace on the basis of race, religion, or gender, Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating against employees who attempt to enforce rights under the Act. 42 U.S.C. § 2000e-3(a).[6]  To establish a prima facie case of retaliation in violation of Title VII, an employee must show that: 1) the employee engaged in protected activity;  2) the employer took adverse employment action against the employee;[7]  and 3) a sufficient causal connection existed between the protected activity and the adverse action.  McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991), citing Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985), abrogated in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) (applying same standard to retaliation claim under Title VII and ADEA).  See also Hopkins, 77 F.3d at 754; and  Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

Generally, once a plaintiff has made the required prima facie showing, the burden shifts to the employer to produce a "legitimate nondiscriminatory reason for the adverse action, thereby

---

[6] Title 42 U.S.C. §2000e-3(a) specifically provides as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

[7] The United States Supreme Court has recently expanded the definition of an adverse employment action to only require a plaintiff to "show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry Co. v. White, ___ U.S. ___, 126 S. Ct. 2405, 2415 (2006) (internal quotations and citations omitted).  However, this distinction is immaterial in this case because there is no dispute that adverse employment actions occurred.

rebutting the presumption of retaliation raised by the prima facie case." Ross, 759 F.2d at 365, citing Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980).

If the employer satisfies this burden of production, "the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual" and that the real motive for the employment action was retaliation. Id., citing Womack, 619 F.2d at 1296. Accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).

Essentially, to prove retaliation a plaintiff must establish that the adverse action would not have occurred "but for" the protected activity. Id. at 365-66. "A causal relationship requires more than simple coincidence . . . Causation requires [that] the employer's action be the consequence of the protected activities and of nothing else." Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995).

There is no dispute that the Plaintiff engaged in protected activity. See 42 U.S.C.A. § 2000e-3(a) (defining "protected activity" as "participating in an ongoing investigation or proceeding under Title VII, or . . . opposing discriminatory practices in the workplace" and defining "participation" as "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII"). Accord Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 259 (4th Cir. 1998) (same). It is also undisputed that subsequent to the Plaintiff engaging in a protected activity, the Defendant took adverse employment actions against him when he was denied permission to take the college course, received negative reviews, was placed on probation, and was ultimately terminated. The Plaintiff's ability to establish a prima facie case depends, therefore, on whether he can establish a causal link between the protected activity and his termination.

Aside from his own speculation, the Plaintiff relies solely on the temporal proximity of the protected activities to the adverse employment actions to establish the causal link between the two. The Fourth Circuit has held that a causal connection for purposes of demonstrating a prima facie case exists where an adverse employment action is taken shortly after the employer learns of the employee's protected activity. See Williams, 871 F.2d at 457. However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (citing cases which held three and four month periods to be insufficient).

A brief timeline of the material facts is helpful to this discussion:

- **March 11, 1998**      the Plaintiff begins work in the Defendant's Street Maintenance Department

- **July 1999**      the Plaintiff first complains about alleged discrimination

- **November 2000**      the Plaintiff meets with Mr. Sanders in Human Resources to discuss alleged discrimination

- **May 17, 2002**      the Plaintiff files his first Charge of Discrimination with the EEOC

- **October 21, 2002**      the Plaintiff transfers to the Engineering Department in the position of Drafting Technician III

- **January 30, 2003**      the Plaintiff files his first lawsuit against the Defendant alleging hostile work environment and retaliation (based on first Charge of Discrimination filed with the EEOC)

- **June 6, 2003**      the Plaintiff receives a favorable six-month initial review from Mr. Hance

17

- **October 21, 2003**   the Plaintiff receives a marginal performance rating on his annual review

- **November 19, 2003**   Mr. Hance signs the Plaintiff's annual review

- **November 24, 2003**   the Plaintiff takes Mr. Sanders' deposition in his first lawsuit

- **December 15, 2003**   Mr. Greene signs the Plaintiff's annual review

- **December 30, 2003**   the Plaintiff writes his response to his annual review

- **January 15, 2004**   the Plaintiff requested and was granted permission to take the college course at issue (as documented by the Plaintiff in his February 4, 2004 EEOC Charge of Discrimination)

- **January 20, 2003**   Mr. Hance tells the Plaintiff he cannot take the college course

- **February 4, 2003**   the Plaintiff files his second Charge of Discrimination with the EEOC (based upon the denial of his request to take the UNCC course)

- **March 3, 2004**   the Plaintiff meets with Mr. Hance and Mr. Meachum to discuss their issues with his performance

- **April 22, 2004**   the Plaintiff is given a rating of unacceptable on his six-month review and placed on ninety-day probation

- **June 2, 2004**   the Plaintiff meets with Ms. Myers, in Human Resources, to discuss his concerns regarding retaliation

- **August 4, 2004**   the Plaintiff is terminated

In examining the timeline of events in the light most favorable to the Plaintiff, it is apparent that several of the protected activities occurred very close in time to the adverse employment actions. Thus, the Court will assume without deciding that the Plaintiff has established a prima facie claim of retaliatory discrimination. See Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) (recognizing

that "a causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity").

Thus, the burden of production now shifts to the Defendant "to establish a legitimate non-retaliatory reason for the action." Id. at 212 (explaining the McDonnell Douglas standard for proving a retaliation claim).

As the above recitation of the facts makes clear, the Defendant's stated reasons for the adverse employment actions were repeatedly stated and well documented. As previously noted, these reasons include the Plaintiff's lack of proficiency in the use of necessary software, taking frequent unscheduled leave, poor communication with other employees and management, slow progress on work projects (despite the fact that when pressured he was able to complete projects in a timely manner – showing that he was capable when he chose to focus), and a general lack of initiative in seeking new assignments. Thus it is clear that the Defendant has met its burden of producing legitimate non-retaliatory reasons for the adverse employment actions in question.

And finally, because the Defendant has established legitimate, non-retaliatory reasons for the employment actions at issue, the burden shifts to the Plaintiff to "show that the employer's proffered reasons are pretextual, [which] the [P]laintiff can prove . . . by showing that the explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." Price, 380 F.3d at 212 (citations and internal quotations omitted). Several factors to consider in this determination include "the strength of the [P]laintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a

matter of law." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 148-49 (2000).

Besides the temporal proximity of events, the Plaintiff cites only his own statements to prove that the Defendant's reasons were pretextual and/or that the adverse employment actions were, in fact, retaliatory. Furthermore, a review of the Plaintiff's statements reveals that they are little more than the Plaintiff's speculation and otherwise unsupported opinion. In other words, absent temporal proximity, the Plaintiff has proffered no evidence beyond his own more favorable view of his job performance to establish pretext or retaliatory discrimination.

While it is true that some of the adverse employment actions occurred closely in time to the Plaintiff's protected activities, it is also true that during the same time period many actions were taken which were <u>beneficial</u> to the Plaintiff. For example, the Plaintiff was hired by the Engineering Department after he filed his first Charge of Discrimination with the EEOC, and received a favorable review from Mr. Hance four months after he filed his first lawsuit against the Defendant.

Rather than retaliation, the timeline in this case presents a picture of an employer who was at first pleased with an employee's performance (in spite of protected activities occurring at the same time), but then began to document serious problems as job performance was more closely observed and/or deteriorated – employer conduct well within the confines of federal and state employment law. Indeed, to find otherwise would essentially be to hold that an employer can take no action against an employee who has engaged in protected activity – even when their performance merits an adverse employment action. This is simply not the state of the law. <u>See</u> <u>Williams</u>, 871 F.2d at 457 ("mere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee").

For these reasons, the Defendant's Motion for Summary Judgment on the Plaintiff's retaliation claim must and will be <u>granted</u>.

### C. <u>Negligent Supervision of an Employee</u>

The Plaintiff argues that the City of Charlotte negligently supervised its employees because "when supervisors in the Engineering Department . . . were retaliating against [him], they were doing so under the scope and authority of the Defendant."  Because this claim rests on the Plaintiff's allegations of retaliation, and the Court has found that insufficient evidence exists to support that claim, the Plaintiff's negligent supervision claim must likewise fail.  Accordingly, the Defendant's Motion for Summary Judgment on this claim will also be <u>granted</u>.

## III. <u>ORDER</u>

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.  The Defendant's "Motion for Summary Judgment" (document #11) is **GRANTED** and the Complaints (3:04CV386-H, and 3:04CV610-H) are **DISMISSED WITH PREJUDICE**.

2.  The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED.**

Signed: April 20, 2007

_Carl Horn, III_

Carl Horn, III
United States Magistrate Judge